UNITED STATES DISTRICT COURT FOR THE
                          DISTRICT OF NEW HAMPSHIRE


Marcella Northrop

     v.                                  Civil No. 10-cv-367-JD
                                         Opinion No. 2011 DNH 041
Michael J. Astrue, Commissioner,
Social Security Administration


                               O R D E R


     Marcella Northrop seeks judicial review, pursuant to 28

U.S.C. § 405(g), of the decision of the Commissioner of the

Social Security Administration, denying her application for

benefits.  Northrop contends that the Administrative Law Judge

("ALJ") improperly assessed her credibility as to the effects of

her impairments, incorrectly assessed her residual functional

capacity, and, as a result, denied her application for benefits

without substantial evidence to support the decision.  The

Commissioner moves to affirm the decision.

Background[1]

Marcella Northrop was born in 1961. She is a high school graduate. Northrop worked at a bank for fourteen years, progressing from teller to branch office manager, with the title of assistant vice president.

Beginning in 2006, Woodsville Internal Medicine was Northrop's primary care provider. In January of 2006, Northrop saw ARAP Cynthia Hallo ran for left hip and right arm pain. She underwent arthroscopic surgery on her right shoulder on March 24, 2006, which resulted in a diagnosis of bursitis and instability. She then experienced left shoulder pain and had arthroscopic surgery in November of 2006 on her left shoulder. The diagnosis was impingement syndrome. She experienced an episode of back pain in 2007 and was advised to limit her activities. Her subsequent visits were for illness, which was unrelated to her disability issues.

Northrop was treated at the North Country Pain Clinic from 2006 to 2009 for fibromyalgia pain, migraine headaches, and sleep issues. During treatment visits, Northrop reported various

---

[1]The parties filed a lengthy Joint Statement of Material Facts that is not organized chronologically but instead is divided by medical providers and other topics and omits certain medical evidence of record. The background section summarizes the statement and other pertinent records.

levels of pain, primarily in her lower back, hips, and shoulders. She also recounted a variety of activities, including household activities of laundry, cooking, cleaning, and even shoveling some snow; swimming; helping a friend open a restaurant; walking her dogs twice a day; and packing to move to a new house.  She also experienced migraine headaches and problems sleeping.  She received medications, physical therapy, and steroid injections to treat her pain and sleep issues.  The pain clinic closed in January of 2009.

In October of 2009, Ammonoosuc Community Health became Northrop's primary care provider.  At a visit on October 14, 2009, Northrop reported that she was not taking medication for pain and that she was experiencing pain in her hips and back that woke her up at night.  Despite the pain, she was walking her three dogs two or three miles each day.  ARAP Nicole Fischler found fibromyalgia tender points but questioned disability.  She noted that although Northrop claimed she could not stand for more than fifteen minutes without needing to stretch, that had not been the case during the forty-five minute appointment.  When Fischler questioned her need for disability, Northrop explained that she would not be able to work because of the time needed for physical therapy and other treatments.

Jeffrey Kay, Psy.D, conducted a mental examination of Northrop on June 17, 2008.  He noted that she walked with a limp and appeared to be stiff.  After discussions with Northrop, Dr. Kay stated that her mood was mildly depressed and anxious and that her affect was somewhat restricted.  In testing, Northrop demonstrated at least normal attention and short-term memory.  Dr. Kay diagnosed dysthymic disorder and stated that pain would interfere with Northrop's ability to complete tasks in a timely manner, that it would be a major challenge for her to maintain concentration in a bank job, and that her pain and low ambition would interfere significantly with her attendance, punctuality, and productivity.

On July 8, 2008, Patricia Salt, Ph.D., a state agency reviewing psychologist, completed a "Psychiatric Review Technique," evaluating Northrop's records pertaining to mental impairments.  Dr. Salt found a dysthymic disorder that caused only mild restrictions in Northrop's daily activities and mild difficulties in maintaining concentration, persistence, or pace.  She found no difficulties in maintaining social functioning and found no episodes of decompensation.

On July 28, 2008, Dr. Hugh Fairley, a state agency physician, reviewed Northrop's records and prepared a "Physical

Residual Functional Capacity Assessment."[2]  Dr. Fairley found that Northrop could perform exertional activities that were consistent with light work.  He indicated limitations for pushing and pulling and a requirement to be able to change from sitting to standing and back on an hourly basis.  Dr. Fairley also found that she was limited to occasionally engaging in postural activities, such as balancing and stooping.

On January 17, 2008, Northrop applied for disability insurance benefits, alleging a disability since April 25, 2006.  Her claim was denied at the initial level, and she requested a hearing.  A hearing was held before an ALJ on February 19, 2010.

Northrop was represented by counsel and testified at the hearing.  She said that she was unable to work because of chronic pain throughout her body which disturbed her sleep and caused depression.  She said that the pain was worst in her lower back, left hip, left knee, and shoulders.  She explained that when the pain was particularly bad, she used a cane.

With respect to her daily activities, Northrop testified that she prepared meals, took care of and walked her dogs, read, and watched television.  She also said that on a good day she

---

[2]Although Dr. Fairley's assessment is referenced in the ALJ's decision and in the Commissioner's motion to affirm, it was not included in the parties' Joint Statement.

could do additional household chores.  She could shop with help from her husband, drive, pay the bills, and handle household finances.  On the other hand, she said that her memory and concentration were impaired, that doing household chores would cause extreme pain for the next several days, and that she had difficulty getting dressed.  She said that she was "thrilled" if she had two good days a month.  She also said that she had migraines and took medication for them.

A vocational expert testified at the hearing.  The ALJ described a hypothetical claimant with a residual functional capacity for doing light work without frequent overhead reaching, who would need to alternate between sitting and standing each hour, and who was limited to simple and repetitive tasks.  The vocational expert identified jobs as a mail clerk, assembler, addresser, and order clerk that would fit the given criteria.  The next hypothetical was for a sedentary residual functional capacity with less than frequent overhead reaching and an ability to alternate between sitting and standing.  The vocational expert testified that the previously identified jobs as addresser and order clerk were examples of jobs that would fit those criteria.  The vocational expert also testified that neither the first nor the second hypothetical claimants could perform Northrop's prior work at the bank.

In the third and fourth hypotheticals, the ALJ added a restriction of at least two unscheduled absences each month and a person with concentration diminished by 15-20% below normal. The vocational expert testified that no jobs were available with those criteria. The vocational expert was unable to give an opinion about the availability of jobs for a person who is easily distracted, a person whose pain would interfere with her timely completion of tasks, and a person whose pain and low ambition would interfere with her attendance, punctuality, and productivity.

The ALJ issued her decision on March 17, 2010. The ALJ found that Northrop had severe impairments of fibromyalgia syndrome, status post shoulder surgeries, migraine headaches, and dysthymia that did not meet or equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ concluded that despite her impairments, Northrop retained the residual functional capacity for sedentary work with limitations that she would require the opportunity to alternate sitting and standing, that she could not do more than occasional overhead reaching, and that the tasks would not require more than simple and repetitive tasks. The ALJ found that Northrop could not return to her former work at the bank. Based on the vocational

expert's testimony, the ALJ concluded that Northrop could work as an addresser or an order clerk and that she was not disabled.

The Decision Review Board notified Northrop that it had selected her claim for review.  On June 17, 2010, the Decision Review Board affirmed the ALJ's decision, making it the final decision of the Commissioner, subject to judicial review.

## Standard of Review

In reviewing the final decision of the Commissioner in a social security case, the court "is limited to determining whether the ALJ deployed the proper legal standards and found facts upon the proper quantum of evidence." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).  The court defers to the ALJ's factual findings as long as they are supported by substantial evidence.  § 405(g).  "Substantial evidence is more than a scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Astralis Condo. Ass'n v. Sec'y Dep't of Housing & Urban Dev., 620 F.3d 62, 66 (1st Cir. 2010).

Disability, for purposes of social security benefits, is "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a).  The ALJ follows a five-step sequential analysis for determining whether an applicant is disabled.  20 C.F.R. § 404.1520.  The applicant bears the burden, through the first four steps, of proving that her impairments preclude her from working.  Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001).  At the fifth step, the burden shifts to the Commissioner to show that work that the claimant can do despite her impairments exists in significant numbers in the national economy.  Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).

## Discussion

Northrop argues that the decision must be reversed because the ALJ conducted a cursory analysis of the evidence of Northrop's pain, improperly discounted Northrop's statements about her limitations, and incorrectly found she retained the functional capacity to do sedentary work.  As a result, Northrop contends, the ALJ's residual functional capacity assessment is wrong, and the record lacks substantial evidence to support the decision.  The Commissioner moves to affirm the decision, countering Northrop's arguments.

A.  <u>Pain and Credibility Assessment</u>

The ALJ found that Northrop's statements about the intensity, persistence, and limiting effects of her impairments were not entirely credible.  Northrop challenges the ALJ's assessment as a cursory analysis that is insufficient to explain the decision not to credit fully her testimony about her impairments.  She argues that the ALJ was required to list and assess each of the factors for evaluating complaints of pain listed in <u>Avery v. Sec. of Health & Human Servs.</u>, 797 F.2d 19, 29-30 (1st Cir. 1986).

Because a claimant's allegations of pain and the effects of her impairments are not conclusive as to her disability but the medical evidence may not demonstrate fully the extent of her limitations, the ALJ is required to evaluate a claimant's complaints in the context of the record as a whole.  20 C.F.R. § 414.1529; SSR 96-7p, 1996 WL 374186; <u>Avery</u>, 797 F.2d at 28.  In particular, the ALJ must consider evidence of the claimant's daily activities; the location, duration, frequency, and intensity of pain and other symptoms; precipitating and aggravating factors; medications and their effects; treatments other than medication; other measures used to relieve pain or symptoms; and other factors that pertain to the claimant's functional limitations.  § 404.1529(c)(3); <u>see also</u> <u>Avery</u>, 797

F.2d at 29-30.  When an ALJ decides not to credit fully a claimant's subjective description of pain and the effects of her impairments, the decision must provide specific reasons for that determination.  SSR 96-7p, 1996 WL 374186, at *4; Rosa v. Astrue, 2011 WL 841180, at *9 (D. Mass. March 9, 2011); Resendes v. Astrue, 2011 WL 669090, at *14 (D. Mass. Feb. 17, 2011); Costa v. Astrue, 2010 WL 4365868, at *9 (D.N.H. Nov. 3, 2010).  The ALJ need not discuss every piece of evidence and every factor to provide a sufficiently articulated decision.  See Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987).

The hearing transcript shows that the ALJ questioned Northrop about the Avery factors, which are also listed at § 404.1529(c)(3).  In the decision, the ALJ noted that the medical records demonstrated that Northrop had remained active since she stopped working in April of 2006 and recounted some of her activities.  The ALJ further noted Northrop's progress in physical therapy, her statement to Dr. Kay that she would have five activities going at a time, ARAP Fischler's observation that Northrop's claimed difficulty with standing was not apparent during her appointment, and Fischler's statement that she questioned Northrop's disability.

The ALJ explained that while Northrop cited recurrent migraines, she had had migraines for many years, including while she was working at the bank. In addition, the ALJ questioned a diagnosis of migraine headache because it was based on Northrop's "self-report." With respect to fibromyalgia, the ALJ found that the diagnosis was not well documented in the record.

The ALJ noted that none of Northrop's treating sources had assessed her functional capacity or suggested that she was unable to work. On review of her records, Dr. Fairley determined that she was capable of light work with certain restrictions. The ALJ, however, gave Dr. Fairley's assessment only partial weight because of Northrop's chronic symptoms, her compliance with treatment, and her increased symptoms with increased exertional activity.

The ALJ fully supported her assessment of Northrop's subjective complaints of the effects of her impairments. In reducing Northrop's residual functional capacity, the ALJ specifically cited the impact her activities had on her symptoms. Although Northrop quibbles with some of the ALJ's characterizations of the evidence, those matters are not material. Therefore, the ALJ's determination of Northrop's credibility and the effects of her impairments is entitled to deference.

B.  <u>Residual Functional Capacity</u>

Northrop challenges the ALJ's residual functional capacity assessment, arguing that the evidence does not support the ALJ's finding that Northrop was capable of sedentary work. To the extent Northrop contends that the ALJ's assessment was wrong because it did not credit the limitations Northrop claimed, that argument is rejected, as is explained above. Northrop also faults the ALJ for failing to incorporate the limitations found by Dr. Kay and the effects of two additional physical impairments. The Commissioner contends that the ALJ properly assessed Northrop's residual functional capacity.

"[Residual functional capacity ("RFC")] is what an individual can still do despite his or her limitations. . . . Ordinarily, RFC is the individual's <u>maximum</u> remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis."  SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996); 20 C.F.R. § 404.1545. In assessing a claimant's residual functional capacity, the ALJ cannot ignore medical evidence, substitute her judgment for that of medical professionals, or improperly discount the opinion of a treating physician. <u>Nguyen</u>, 173 F.3d at 33.

In this case, the ALJ relied on Dr. Fairley's assessment to find that Northrop retained the ability to work at the sedentary level, with certain limitations.  Northrop argues that Dr. Kay's findings that her pain and low ambition would interfere significantly with her attendance, punctuality, and productivity demonstrate that she was unable to work.

The ALJ considered Dr. Kay's assessment, along with Dr. Fairley's and Dr. Salt's assessments.  The ALJ noted that Dr. Salt did not find any severe impairments.  Nevertheless, the ALJ concluded that Dr. Kay's assessment, of significant interference, supported a conclusion that Northrop had "at least moderately impaired ability to maintain attention, concentration and pace." On that basis, the ALJ found that those impairments were severe at Step Two of the sequential analysis.  The ALJ thoroughly discussed Northrop's restrictions due to mental impairment and limited Northrop's residual functional capacity to sedentary work that required performing only simple and repetitive tasks.

Northrop faults the vocational expert for declining to consider limitations posed by her counsel at the hearing, which were based on Dr. Kay's opinion, that her pain and low ambition would "interfere significantly" with her work.  The vocational expert objected that "significantly" is not a term used within the social security framework.  Northrop does not contend that

14

her limitations should have been found to be "marked" rather than "moderate," which are the terms used in the social security regulations. See 20 C.F.R. § 404.1520a. Instead, she insists that the vocational expert should have considered the limitations using the term "significantly." She also argues, in passing, that if Dr. Kay's evaluation was too vague, the ALJ should have contacted Dr. Kay for clarification.

Social security applications are assessed within a highly-developed regulatory framework. Northrop's argument that other terms or criteria should be considered for purposes of determining disability ignores the requirements of the governing regulations. With respect to obtaining clarification of Dr. Kay's findings, as the ALJ explained, the findings were interpreted by Dr. Salt. No further clarification was required. See 20 C.F.R. § 404.1512(e).

Northrop also contends that the ALJ erred in failing to find that she had severe impairments caused by spurring in the left femur and degenerative disc disease. Northrop cites medical records that refer to spurring in the left femur and borderline disc herniation. The ALJ considered Northrop's low back, hip, knee, and shoulder pain. Northrop does not explain in what ways spurring and disc disease increased her restrictions or limitations. Therefore, the ALJ's residual functional capacity

assessment is not wrong due to the absence of express consideration of spurring and disc disease.

C. Vocational Expert's Opinions

Northrop asserts that the vocational expert's opinion about the jobs available that she could do was not competent evidence because the vocational expert could not substantiate his opinion with specific experience or demonstrate that it was based on reliable methods. As Northrop acknowledges, Federal Rule of Evidence 702 does not apply to social security proceedings. Donahue v. Barnhart, 279 F.3d 441, 446 (7th Cir. 2002). A vocational expert may give an opinion about what jobs are available that the claimant can do, which is then subject to examination by the claimant's attorney.[3]  Id.

In this case, contrary to the circumstances in Donahue, Northrop is not arguing that the vocational expert's opinion conflicts with the Dictionary of Occupational Titles. Instead, she argues that the vocational expert did not demonstrate that he had sufficient experience to know how many of the jobs he said she could do would allow a sit or stand option. The vocational expert testified that his thirty years of experience in job

---

[3]As in Donahue, Northrop was represented by counsel at the hearing.

placement, labor market surveys, and job analysis supported his opinion that a sit or stand option was available for jobs as an addresser and order clerk.

Northrop faults the vocational expert for his inability to identify when he had most recently observed the jobs of addresser and order clerk with a sit or stand option.  Although the vocational expert's explanation of the basis of his opinion was vague, as Northrop charges, it was not entirely lacking, given his undisputed length of experience in the field.  In addition, other vocational experts, based on their professional experience, have testified recently that the same jobs of addresser and order clerk provide a sit or stand option.  See, e.g., Leach v. Social Sec. Admin. Com'r, 2010 WL 5366300, at *2 (D. Me. Dec. 21, 2010); Padgett v. Com'r of Social Sec., 2010 WL 3081440, at *8 (D.N.J. Aug. 3, 2010); Hicks v. Astrue, 718 F. Supp. 2d 1, 9-10 (D. Conn. 2010); Weber v. Astrue, 2010 WL 1727380, at *8 (D. Utah April 28, 2010); Saxon v. Astrue, 662 F. Supp. 2d 471, 476 (D.S.C. 2009).

When an accurate residual functional capacity assessment is provided to a vocational expert, the expert's opinion based on that assessment constitutes substantial evidence.  Johnson v. Astrue, 627 F.3d 316, 321 (8th Cir. 2010); Tetrault v. Astrue, 2011 WL 613701, at *5 (D. Mass. Feb. 11, 2011).  Under the

circumstances presented in this case, the vocational expert's opinions provide substantial evidence to support the decision.

## Conclusion

For the foregoing reasons, the claimant's motion to reverse (document no. 6) is denied. The Commissioner's motion to affirm (document no. 9) is granted.

The decision of the Commissioner is affirmed. The clerk of court shall enter judgment accordingly and close the case.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
United States District Judge

March 18, 2011

cc: Ruth Dorothea Heintz, Esquire
    T. David Plourde, Esquire